UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL DOCKET NO. |
| VERSUS | 14-10-SDD-RLB-2 |
| JOSHUA SMITH | |

**RULING**

Defendant Joshua Smith ("Defendant" or Smith") has been charged by *Indictment*[1] with knowingly and intentionally possessing, with the intent to distribute, five or more grams of methamphetamine in violation of federal law. This matter is before the Court on the Defendant's *First Motion to Suppress Evidence*[2] filed on April 17, 2014. The United States filed its *Memorandum in Opposition*[3] on May 2, 2014. On July 3, 2015, the Court held an evidentiary hearing and took the motion under advisement.

I.  **FACTUAL BACKGROUND**

On February 13, 2013, around 10:38 p.m., Smith's vehicle was stopped by Port Vincent police officer Brant Villenurve, who had observed the Smith's black Acura with the license plate visually obstructed. Danielle Harrell was a passenger in the automobile. Officer Villenurve stopped the car, and Officer Villenurve testified that Smith exited the vehicle rapidly and approached the police unit with his driver's license and insurance card in hand. Smith stated that he did not have his registration but it was later located. Officer Villenurve testified that, during this stop, Smith was sweating and was "choppy in his conversation." Despite this observation, Officer Villenurve

---
[1] Rec. Doc. 1.
[2] Rec. Doc. 30.
[3] Rec. Doc. 32.

testified that he did not feel the need to conduct a safety pat down of Smith. After taking Smith's information, Officer Villenurve returned to the police unit and called in Smith's driver's license to check for outstanding warrants and verify car ownership. It was estimated that within one to two minutes of the stop, Officer Villenurve had verified the license plate, driver's license, and that no warrants were outstanding for Smith. However, based on Officer Villenurve's observations about Smith's nervousness and the passenger "moving around a lot" in the vehicle, Officer Villenurve called for back-up. Seven minutes later, at 10:45 pm, Police Chief Michael Durkin arrived on the scene.

      Chief Durkin testified at the hearing that, prior to this traffic stop, he was familiar with Joshua Smith by reputation. Durkin stated that Smith was believed to be a member of the Banditos motorcycle gang and a suspected drug dealer. Upon his arrival, Chief Durkin noticed that the inspection sticker on Smith's vehicle was expired. At this point, the testimony of Chief Durkin and Officer Villenurve somewhat diverges. According to Chief Durkin, when he arrived on the scene, Villenurve was in his police unit and Smith was standing behind the rear of the automobile and the front of the police unit. Chief Durkin testified that he could not recall performing a safety pat down of Smith upon his arrival. Chief Durkin also testified that, when he realized that Officer Villenurve did not have the vehicle's registration, he accompanied Smith back to the vehicle at which point Smith reached in through the driver's side door and retrieved the vehicle registration from the glove box. Chief Durkin testified that he did not recall seeing any movements by Harrell. Chief Durkin said he then verified the VIN number on the registration with the VIN number on the automobile. According to Durkin, as he

and Smith walked back to the police unit, Officer Villenurve approached the driver's side of Smith's vehicle.

Although he had already received information from dispatch that everything checked out, Officer Villenurve claims he then approached Smith's vehicle in order to retrieve the vehicle registration. Villenurve testified that he recognized the passenger, Danielle Harrell, from having seen her work at Popeye's and did not consider her an immediate threat. While Officer Villenurve testified that it is routine to ask a passenger to exit a vehicle, he did not ask Harrell to step out of the car prior to approaching the vehicle despite allegedly observing her quick movements. Officer Villenurve stated that it was his intent to ask Harrell to retrieve the registration from the vehicle's glove box; however, her alleged movements around the area of the center console made him suspicious of the possible presence of a weapon or narcotics. Based on this suspicion, Officer Villenurve reached over the passenger into the vehicle and opened the center console whereupon he discovered several plastic bags of methamphetamine and other drug paraphernalia. After this discovery, Officer Villenurve ordered Harrell out of the car.

At this point, Villenurve told Chief Durkin to place Smith under arrest, and Villenurve placed Harrell under arrest. A search of the vehicle incident to these arrests later revealed a black leather pouch in the driver's side door panel which contained $15,000 in denominations of one hundred dollar bills.

## II. ARGUMENTS

Smith moves to suppress the evidence obtained in this search, arguing that the officers lacked probable cause to search his vehicle based on the facts of the stop.

Smith contends that, having failed to offer proof of registration and due to an obstructed license place, a citation should have been issued, and the traffic stop should have ended. Further, Smith contends the jurisprudence clearly rejects the concept of "search incident to citation," and, therefore, the police needed probable cause to search the vehicle. Additionally, Smith contends that his passenger simply moving her arm did not justify the search to ensure officer safety because it was an "unthreatening" movement.

The Government contends the Defendant's reliance on the Fourth Amendment in alleging a constitutional violation is misplaced because only a standard of "reasonable suspicion" applied during this traffic stop. Further, the Government contends that both Smith's behavior along with the passenger's movements near the console justified the officers' search of the vehicle to ensure that the passenger was not concealing a weapon. Thus, the Government argues the motion should be denied.

## III. LAW AND ANALYSIS

Generally, "[t]he proponent of a motion to suppress has the burden of proving, by a preponderance of the evidence, that the evidence obtained was in violation of his Fourth Amendment rights."[4] Conversely, at a suppression hearing, the Government must prove, by a preponderance of the evidence, that the challenged evidence was lawfully obtained.[5]

The legality of traffic stops is analyzed for Fourth Amendment purposes under the standard articulated in *Terry v. Ohio*.[6] "This standard is a two-tiered reasonable suspicion inquiry: (1) whether the officer's action was justified at its inception, and (2)

---

[4] *United States v. Kelley*, 981 F.2d 1464, 1467 (5th Cir.1993) (quoting *United States v. Smith*, 978 F.2d 171, 176 (5th Cir. 1992)(internal quotation marks omitted).
[5] *United States v. Valenzuela*, 716 F.Supp.2d 494, 500 (S.D. Tex. 2007)(citing *United States v. Matlock*, 415 U.S. 164, 178 n. 14 (1974).
[6] 392 U.S. 1 (1968).

whether the search or seizure was reasonably related in scope to the circumstances that justified the stop in the first place."[7]  "In addition, 'the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time.'"[8] "However, once an officer's suspicions have been verified or dispelled, the detention must end unless there is additional articulable, reasonable suspicion."[9]  "'At that point, continuation of the detention is no longer supported by the facts that justified its initiation.'"[10]

### A. Justified At Inception

Considering the first prong of the *Terry* analysis, the Fifth Circuit has held that, "for a traffic stop to be justified at its inception, an officer must have an objectively reasonable suspicion that some sort of illegal activity, such as a traffic violation, occurred, or is about to occur, before stopping the vehicle."[11]  The Supreme Court has instructed that in making a reasonable suspicion inquiry, a court "must look at the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing."[12]  The Fifth Circuit has held that "reasonable suspicion exists when the officer can point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the search and seizure."[13]

---

[7] *United States v. Valadez*, 267 F.3d 395, 398 (5th Cir.2001) (citing *Terry*, 392 U.S. at 19–20).
[8] *Id*. (quoting *Florida v. Royer*, 460 U.S. 491, 500 (1983)).
[9] *Id.*
[10] *Id*. (quoting *United States v. Shabazz*, 993 F.2d 431, 436 (5th Cir. 1993)).
[11] *United States v. Lopez–Moreno*, 420 F.3d 420, 430 (5th Cir. 2005).
[12] *United States v. Arvizu*, 534 U.S. 266, 273 (2002).
[13] *Lopez–Moreno*, 420 F.3d at 430.

In evaluating the totality of the circumstances, a court may not consider the relevant factors in isolation from each other.[14] In scrutinizing the officer's basis for suspecting wrongdoing, it is clear that the officer's mere hunch will not suffice.[15] It is also clear, however, that reasonable suspicion need not rise to the level of probable cause.[16]

The Fifth Circuit has also held that a traffic stop must be justified at its inception: "if the alleged traffic violation forming the basis of the stop was not a violation of state law, there is no objective basis for justifying the stop."[17] The Government bears the burden of proving that a stop was constitutional where the stop and search were conducted without a warrant.[18]

**B. Reasonable Suspicion of Criminal Activity**

Once a traffic stop has been justified, an officer can lawfully continue a detention if he has a "reasonable suspicion supported by articulable facts that a crime has been or is being committed."[19] "If the officer develops reasonable suspicion of additional criminal activity during his investigation of the circumstances that originally caused the stop, he may further detain its occupants for a reasonable time while appropriately attempting to dispel this reasonable suspicion."[20]

Both the Supreme Court and the Fifth Circuit have "emphasized that courts must allow law enforcement 'officers to draw on their own experience and specialized training

---

[14] *Arvizu*, 534 U.S. at 274.
[15] *Terry*, 392 U.S. at 27.
[16] *Arvizu*, 534 U.S. at 274.
[17] *United States v. Raney*, 633 F.3d 385, 390 (5th Cir. 2011).
[18] *Id.* at 392.
[19] *United States v. Santiago*, 310 F.3d 336, 342 (5th Cir. 2002).
[20] *United States v. Pack*, 612 F.3d 341, 350 (5th Cir. 2010) *opinion modified on denial of reh'g*, 622 F.3d 383 (5th Cir. 2010) *cert. denied*, 131 S.Ct. 620, 178 L.Ed.2d 450 (U.S.2010) and *cert. denied*, 131 S.Ct. 620, 178 L.Ed.2d 450 (U.S.2010).

to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person.'"[21] The Fifth Circuit noted that:

> [W]e do not presume to prescribe in the abstract the scope of questioning, investigative techniques, or length of permissible detention that may be undertaken following a valid traffic stop. The bounds of existing caselaw are clear, if fact-intensive: a traffic detention may last as long as is reasonably necessary to effectuate the purpose of the stop, including the resolution of reasonable suspicion, supported by articulable facts within the officer's professional judgment, that emerges during the stop.[22]

**C. Application**

There is no dispute that the traffic stop at issue was justified at its inception. An obscured license plate is a violation of Louisiana law and justifies a traffic stop. Therefore, in light of the foregoing framework, the Court must examine whether Officer Villenurve discovered the drugs and drug paraphernalia while effectuating the initial purpose of the stop or whether there was reasonable suspicion to justify extending the stop beyond its initial purpose, and whether Officer Villenurve and Chief Durkin's actions unreasonably prolonged the stop.

Under *United States v. Brigham*,[23] certain police activities are clearly "within the scope of investigation attendant to the traffic stop." These activities include requesting documents such as driver's licenses, registrations, running a computer check on those documents, and asking questions about the purpose of the driver's trip.[24] Thus, Officer Villenurve was well within his duties when he detained Smith long enough to check the status of Smith's documentation and for any outstanding warrants. However, Officer Villenurve testified at the hearing that this check took one to two minutes. He also

---

[21] *United States v. Brigham*, 382 F.3d 500, 507 (5th Cir. 2004), quoting *Arvizu*, 534 U.S. at 273.
[22] *Id.* at 512.
[23] *Id.* at 507-08.
[24] *Id.*

testified that, although Smith appeared nervous in his mannerisms and was sweating, Officer Villenurve did not consider him a threat and did not conduct a safety pat down. Furthermore, when Officer Villenurve approached the vehicle for the registration, he was already aware that the vehicle license plate and Smith's driver's license had checked out. "Once an officer's suspicions have been verified or dispelled the detention must end unless there is additional articulable reasonable suspicion."[25] "If additional reasonable suspicion arises in the course of the stop and before the initial purpose of the stop has been fulfilled, then the detention may continue until the new reasonable suspicion has been dispelled or confirmed."[26]

Officer Villenurve testified that he called for back-up based on the nervous behavior of Smith and his observations that Harrell was "moving around a lot." Chief Durkin arrived seven minutes after this call, arguably five minutes after all of Smith's documentation had been adequately confirmed. The Court is not persuaded that Officer Villenurve's discovery of an expired inspection sticker as he approached the vehicle constituted a "new crime" that created additional reasonable suspicion which justified prolonging the stop. Again, the documentation provided by Smith had checked out, and Villenurve could have simply added the expired inspection tag to the citation for an obscured license plate. Any argument that the expired inspection sticker justified prolonging this stop is unsupported by the testimony of the officers.

The officers' testimony also reflects that Officer Villenurve approached Harrell in the passenger side of the vehicle after Chief Durkin arrived and was questioning Smith at the rear of the vehicle. Officer Villenurve testified that he recognized Harrell as he

---

[25] *Valadez*, 267 F.3d at 398.
[26] *Lopez-Marino*, 420 F.3d at 431.

had seen her working at Popeye's and that he did not consider her a threat to his safety. Officer Villenurve also testified that, although it is routine to ask a passenger to exit the vehicle to ensure officer safety, he did not ask Harrell to exit the vehicle prior to approaching. When directly asked what Officer Villenurve observed when he approached Harrell, he responded: "The passenger? When I approached it I was concerned that she either concealed something in the console or concealed a weapon or narcotics, or something along them lines."[27] Chief Durkin testified that when he approached the vehicle with Smith for the registration, he did not observe any movements by Harrell, and he had no safety concerns regarding Harrell.

Based on the testimony of both officers and the circumstances as set forth above, the Court finds that Officer Villenurve did not have reasonable suspicion based on "specific and articulable facts" rather than mere "inarticulate hunches of wrongdoing."[28] Moreover, "nervousness, standing alone, generally is not sufficient to support reasonable suspicion."[29] Analyzing the totality of the circumstances in this case, the Court does not believe that the officers had a "particularized and objective basis for suspecting legal wrongdoing."[30]

More troublesome to the Court is the testimony by Chief Durkin that, upon receiving the call for back-up by Officer Villenurve, Chief Durkin was familiar with Smith by reputation and knew that Smith was believed to be a member of the Banditos motorcycle gang as well as a suspected drug dealer. The Court cannot ignore the fact

---

[27] Testimony of Officer Villenurve in response to examination by AUSA Mike Jefferson at 7/3/14 hearing.
[28] *See United States v. Ibarra-Sanchez*, 199 F.3d 753, 758 (5th Cir. 1999)(quoting *Terry*, 392 U.S. at 21).
[29] *See United States v. Santiago*, 310 F.3d at 342; *see also United States v. Beck*, 140 F.3d 1129, 1138 (8th Cir. 1998)("It certainly cannot be deemed unusual for a motorist to exhibit signs of nervousness when confronted by a law enforcement officer."); *United States v. Wood*, 106 F.3d 942, 948 (10th Cir. 1997)("It is certainly not uncommon for most citizens – whether innocent or guilty – to exhibit signs of nervousness when confronted by a law enforcement officer.").
[30] *Arvizu*, 534 U.S. at 273.

that, at this point, all of Smith's documentation had checked out and he could have been issued a citation and released. The Court can only conclude that the traffic stop continued on the basis of Chief Durkin's awareness of Smith's alleged reputation for criminal activity. If "prior arrests, standing alone, do not amount to reasonable suspicion,"[31] and "past criminal history, 'by itself, does not create a reasonable suspicion that criminal activity is currently afoot,'"[32] then it necessarily follows that a defendant's alleged *reputation* for criminal history alone is likewise insufficient to create reasonable suspicion. In *United States v. Eskichyan*,[33] a patrol officer had detained the defendants after stopping them for a traffic violation, and, based on the officer's knowledge of the defendants' prior criminal histories, he called for back-up. The court stated:

> The Court also does not doubt that defendants' criminal histories may have been In Officer Averette's mind and that he was frightened when he called for backup. But no amount of training or experience can turn the simple, objective facts that defendants had criminal histories and exhibited ordinary nervousness into articulable suspicion that defendants were about to commit a crime. If such common circumstances qualified as reasonable suspicion, then many—if not most—interstate travelers would be subject to prolonged detention. Weighing the totality of the circumstances, the Court finds that the officer lacked the requisite reasonable suspicion to detain defendants after the computer check was complete, and therefore, the detention was unconstitutional.[34]

---

[31] *United States v. Jackson*, 517 F.Supp.2d 859, 870 (W.D. La. 2007)(citing *United States v. Dortch*, 199 F.3d 193, 196 (5th Cir. 1999)).
[32] *United States v. Eskichyan*, No. 09-CR-152, 2010 WL 4054295, at *6 (M.D. La. Oct. 13, 2010)(quoting *Joshua v. DeWitt*, 341 F.3d 430, 446 (6th Cir.2003) (citing *Terry v. Ohio*, 392 U.S. 1, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)); *see also United States v. Mathurin*, 561 F.3d 170, 177 (3d Cir.2009); *United States v. Sprinkle*, 106 F.3d 613, 618 (4th Cir. 1997); *United States v. Johnson*, 427 F.3d 1053, 1057 (7th Cir. 2005); *Burrell v. McIlroy*, 464 F.3d 853, 858 n. 3 (9th Cir. 2006); *United States v. Rice*, 483 F.3d 1079, 1085 (10th Cir. 2007) (citing *United States v. Davis*, 94 F.3d 1465, 1468 (10th Cir. 1996)).
[33] *Id.*
[34] *Id.*

Certainly, the Court acknowledges that patrol officers face potential dangers in every traffic stop, and the Court recognizes the need to ensure officer safety during any routine traffic stop, particularly at night or in a high crime environment. However, the hearing testimony of the officers on the scene in this case undermines any claim that they feared for their safety during this particular traffic stop. Both officers testified that they did not consider either Smith or Harrell as threats to their safety, did not conduct pat downs of either Smith or Harrell prior to their eventual arrests, and did not order Harrell out of the car, as was routine procedure, to separate her from any potential weapon. Additionally, while "furtive gestures or suspicious movements"[35] are relevant factors to consider in analyzing whether officers had reasonable suspicion, the Court must conduct a totality of the circumstances analysis. The Court finds that any alleged movement of Harrell's arm, in light of the testimony, actions, and inactions of the officers during the stop, was insufficient to create reasonable suspicion and justify prolonging a traffic stop that should have concluded when all of Smith's information was verified.

## IV. CONCLUSION

For the reasons set forth above, the Defendant's *First Motion to Suppress Evidence*[36] is GRANTED.

**IT IS SO ORDERED.**

Signed in Baton Rouge, Louisiana, on <u>August 8, 2014</u>.

*Shelly D. Dick*
**JUDGE SHELLY D. DICK**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

---

[35] *See United States v. Watson*, 953 F.2d 895, 897 (5th Cir. 1992).
[36] Rec. Doc. No. 30.